*The Howard Research & Development Corporation v. IMH Columbia, LLC*, No. 0752, September Term, 2024. Opinion by Eyler, James R. Filed December 19, 2025.

**REAL PROPERTY – INTERPRETATION OF RESTRICTIVE COVENANTS**

IMH Columbia, LLC ("IMH"), appellee, filed suit against The Howard Research & Development Corporation ("HRD"), appellant, seeking declaratory relief and asserting claims for detrimental reliance and for breach of restrictive covenants encumbering a lot in the Columbia Town Center that IMH sought to develop ("the Property"). HRD is the entity charged with enforcing those covenants, along with an architectural review committee ("ARC") created by the covenants. After IMH commenced the first phase of its development, HRD notified it that it was rejecting the second phase proposal in its "sole and absolute discretion" under the covenants because the proposal included residential uses and on-site parking.

The circuit court made preliminary rulings interpreting the covenants and the remaining factual disputes were tried to a jury, which returned a verdict in favor of IMH on all counts, including alternative theories that HRD breached the covenants and that the covenants were obsolete and unenforceable, and awarded IMH nearly $17 million in damages.

Where the language of the instrument containing a restrictive covenant is unambiguous, a court should simply give effect to that language. Subsections (a) and (c) of the Parking Covenants unambiguously required HRD's consent for on-site parking, but did not require HRD's consent for a change in use that increased the need for parking so long as that additional parking would not be situated in common parking areas located on HRD's property. Because the jury found that HRD consented to onsite parking and that IMH's proposal did not increase the need for common parking areas – verdicts not challenged by HRD on appeal – and because the trial court made an unchallenged preliminary ruling that ARC, not HRD, was the entity that could approve or reject the change to residential use, HRD breached the covenants by rejecting IMH's proposal because it was not empowered to do so. As a result of our holding, the jury's verdicts that certain restrictive covenants are obsolete and unenforceable are immaterial to the outcome of the appeal.

**COMPENSATORY DAMAGES – DOUBLE RECOVERY PROHIBITED – REASONABLE CERTAINTY**

It is well-established that a plaintiff may not doubly recover the same damages under different legal theories that arise from the same basic facts. The damages awarded by the jury were not duplicative. IMH was entitled to recover its lost return on investment for the period between the rejection of the second phase of its development until the time of trial, which was premised upon an expected rate of return based upon a similar mixed-use development in the same area. It also was entitled to recover the increased cost to finance

the second phase owing to rising interest rates in the interim. Both sets of damages were present damages, not future damages, and both were established with reasonable certainty.

Circuit Court for Howard County
Case No. C-13-CV-22-000212

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0752

September Term, 2024

_____

THE HOWARD RESEARCH &
DEVELOPMENT CORPORATION

v.

IMH COLUMBIA, LLC
_____

Wells, C.J.,
Berger,
Eyler, James R.
        (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, James R., J.
_____

Filed: December 19, 2025

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

More than fifty years ago, James Rouse ("Rouse") established Columbia, Maryland as one of the first planned cities in the United States. The Howard Research and Development Corporation ("HRD"), appellant, which is now a wholly owned subsidiary of the Howard Hughes Corporation ("HHC"), was created as one of the entities that would record among the land records and enforce certain restrictive covenants encumbering various parcels of land that subsequently were conveyed to other parties. This included an area known as Lakefront North.

In December 2017, IMH Columbia, LLC ("IMH"), appellee, purchased a lot in Lakefront North with the intention of renovating and modernizing an existing hotel, demolishing short-term rental lodges, replacing them with a mixed-use development, and constructing underground, on-site parking. Both the residential use and the on-site parking required prior approval under the relevant covenants. Two years later, in December 2019, after IMH had begun the first phase of its development plan – the renovation of the hotel – HRD notified IMH that it had rejected the residential use change and on-site parking for the second phase – the mixed-use development – in its sole and absolute discretion.

IMH filed suit against HRD in the Circuit Court for Howard County, seeking declaratory relief and asserting claims for detrimental reliance and breach of the covenants. After the court made preliminary rulings interpreting certain aspects of the covenants as a matter of law, the case was tried to a jury. The jury returned a special verdict in favor of IMH on all issues presented to it and awarded nearly $17 million in

damages. HRD's motions for judgment notwithstanding the verdict ("JNOV") and remittitur were denied,[1] and this timely appeal followed.

HRD presents three questions for our review, which we reorder and rephrase:

I. Did the circuit court err as a matter of law in construing Parking Covenant (c), entitling HRD to judgment or a new trial on IMH's claims for breach of the covenants and detrimental reliance?

II. Did the circuit court propound erroneous jury instructions on the law of obsolescence, entitling HRD to judgment as a matter of law on the declaratory judgment count or, alternatively, a new trial?

III. Did the jury award duplicative damages and/or are the damages unsupported by sufficient evidence or subject to reduction as excessive?

We answer the first question, "No," which, for reasons we will explain, resolves the issue of HRD's liability. Consequently, we decline to reach the second issue. We also answer "No" to the third question and thus affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### History of and Restrictions upon Lots in Lakefront North

Lakefront North is part of Columbia's Town Center, located between the manmade Lake Kittamaqundi to the east and Little Patuxent Parkway and The Mall in

---

[1] HRD's motions for JNOV and for remittitur both were deemed filed within ten days of the judgment after accounting for an issue with MDEC. While those motions were pending, HRD noted this appeal. Thereafter, the circuit court denied the motion for JNOV on June 26, 2024. It entered an order reserving upon the motion for remittitur, however, pending the disposition of this appeal.

Concluding that the pending motion for remittitur deprived the judgment of finality, this Court stayed the appeal and remanded this case to the circuit court to rule on the motion for remittitur or for the motion to be withdrawn. On November 20, 2025, the circuit court denied the motion. By order entered November 26, 2025, we lifted the stay, allowing this appeal to proceed.

Columbia to the west. For more than thirty years, Lakefront North was entirely commercial, consisting of a hotel, originally the Columbia Inn; the Lodges, which are two-story short-term lakefront rental cottages adjacent to the hotel; restaurants; a movie theater; other retail and office uses; and, as we will discuss, centralized, shared surface parking lots for all these amenities.

Rouse, through HRD, caused all lots in Lakefront North to be subjected to a Declaration of Parking Covenants, executed on March 9, 1971. By deed dated March 15, 1971, the lot that is the subject of the instant appeal (hereinafter "the Property") was conveyed by HRD to Columbia Inn, Inc., subject to Special and General Covenants and Restrictions, which were incorporated into the deed by reference. In 1998, Columbia Inn's successor in interest modernized the hotel into a Sheraton and entered into a Declaration of Restrictions with HRD. We discuss the relevant provisions of these documents, each of which was duly recorded in the land records of Howard County, in turn.

### 1. Parking Covenants

The Parking Covenants subject all lots in Lakefront North to "certain covenants, agreements, easements and restrictions[.]" Four, lettered introductory provisions state that any person taking title to a lot in Lakefront North is

deemed to have covenanted and agreed with HRD as follows:

(a) That it will not, *without the consent of HRD*, employ any portion of such Lot for Parking Spaces (as defined in Section 4.01);

(b) That it will cause to be constructed, on land owned by HRD, in such areas as may be designated by HRD, Parking Spaces and related

-3-

driveways, ramps and sidewalks which are available for the general use of occupants of Town Center, their customers and invitees (hereinafter called "Common Parking Areas"), which are at least sufficient in number and which are located in such manner as will satisfy the requirements of Articles IV and V hereof for the improvements being built upon such Lot; and

(c) That it will not, *without the consent of HRD*, permit any alteration to the use or size of improvements as originally built upon such Lot which alteration would result in the need for additional parking areas as determined by Articles IV and V hereof.

(d) That it will pay the cost of maintenance of such Common Parking Areas in accordance with the terms of Article IX hereof.

(Emphasis added.)

The Parking Covenants continue in full force and effect for an initial term of thirty-five years (until March 1, 2006), at which time they automatically extend for successive ten-year terms unless modified as permitted by § 3.02.

Article IV governs "Parking Indices." At § 4.02, it sets out the number of parking spaces an owner of a lot must provide based upon a combination of the floor area of the improved portion of the lot and the use for which the lot is intended. Article V established the proximity of the parking areas to the entrances of businesses within Lakefront North.

HRD retained the "sole discretion" to construe the Parking Covenants should any "discrepancy, conflict or ambiguity" arise, in the absence of "any adjudication by a court of competent jurisdiction to the contrary[.]" In enforcing the Parking Covenants, HRD was obligated to "take into consideration the best interests of the Owners and of

-4-

[Lakefront North] to the end that [Lakefront North] shall be preserved and maintained as a first-class town center."

Article VII governs the role of the Architectural Review Committee ("ARC"), which is established under the General Covenants.[2] Under § 7.02, ARC is the entity authorized to approve in writing any plan to construct a parking facility or structure on "any Lot[,]" as opposed to on HRD's property.

The Parking Covenants were twice amended, once in May 1971 and a second time in January 2016. The 2016 amendment adopted the "Downtown Methodology" in place of the Article IV Parking Indices and the statutory definition of "parking space."

### 2. *Special Covenants and Restrictions*

The Special Covenants state that the Grantee agreed for itself and its successors, including IMH, that the Property would be used "solely" "to conduct the business of providing transient hotel accommodations" and related uses, including rentals of banquet and meeting space within the hotel, a travel agency, a car rental office, a telegraph office, a barber or beauty shop, and a small scale retail store in the lobby of the hotel.

For the first fifteen years – until March 15, 1986 – any change in those approved uses for the Property was subject to HRD's prior written approval in its "sole unreviewable discretion[.]" Thereafter, ARC was charged with providing prior written approval for any change in use. In making its determination, ARC is required to consider

---

[2] ARC is referred to as the Architectural Committee in many of the recorded documents, but the parties agree that it is now known as the Architectural Review Committee, and we will refer to it as such.

"the necessity for and the suitability of the proposed use in the neighborhood, its effect on surrounding property, and the nature, quality, appearance and general compatibility of the structure proposed for such use to the character of the neighborhood[.]" Further, ARC's approval of a change in use may not be "unreasonably withheld." ARC is also charged with approving materials, color schemes, and the general appearance of any new structures.

The Special Covenants "are intended to be complementary to the General Covenants . . . and to be solely for the benefit of HRD[.]" In the event of any conflict between the Special Covenants and the General Covenants, the provisions of the Special Covenants prevail.

### 3.  General Covenants and Restrictions

Article IV of the General Covenants governs "Use of Property; Restrictions[.]" Two sections are relevant here:

> 4.02. <u>No Residences</u>. No building or other Structure on the Property shall be used, temporarily or permanently, as a residence or for any other purpose other than such as may be permitted by the terms and provisions of the Deed[.]
>
> * * *
>
> 4.04. <u>Parking</u>. No parking of vehicles shall be permitted on the Property except that the Owner may provide for temporary visitor parking, not to exceed ten (10) parking spaces, in any driveway serving the entrance to the improvements constructed on the Property, the number and location of which shall be subject to approval of [ARC.]

(Emphasis in original.)

Article V establishes ARC. Section 5.01 specifies that it will be a committee composed of three or more persons "so designated from time to time by HRD." HRD agreed to appoint the members and bear any costs associated with running ARC for the first fifteen years (until March 15, 1986) and continuing thereafter until such time as it gave written notice to the lot owner that it was relinquishing that responsibility.

Section 5.02 governs the submission and approval process for ARC. Section 5.03 governs the factors it may consider in disapproving of a plan, including a change in use, but specifies that if it disapproves of a plan, it must do so "accompanied by a statement of the grounds upon which such action was based" and, upon request, shall provide feedback to the applicant about steps it can take to modify the proposal to achieve approval.

Article IX empowers HRD, in its "sole discretion," to resolve and determine any discrepancies, conflicts, or ambiguity in the General Covenants. "[I]n the absence of an adjudication by a court of competent jurisdiction to the contrary," HRD's construction of the covenants is final and binding.

### 4. *Declaration of Restrictions*

The 1998 Declaration of Restrictions provides that the owner of the Property agrees that the hotel "shall be operated as a 'Full Service Hotel[.']"

### IMH's Purchase of the Property

In 2017, David Costello, the president of Costello Construction, Inc., a commercial general contractor, formed IMH with the intent to purchase the Property. Mr. Costello had experience developing property in Columbia's Town Center. In 2011, he

developed Little Patuxent Square, a mixed-use development with 160 residential units, an office tower, and below grade parking in Lakefront North.

In early June 2017, IMH entered into a confidentiality agreement with the owner of the Property. Around the same time, Mr. Costello met with John DeWolf, the then president of the Columbia division of HRD's parent company, HHC. He advised Mr. DeWolf that IMH envisioned building a mixed-use project like Little Patuxent Square on the Property with "predominantly on-site" parking, but possibly a "small encroachment" into the shared parking on HRD's property.

Thereafter, IMH signed a letter of intent and began a due diligence period. Mr. Costello had additional conversations with Mr. DeWolf during this time during which he reiterated IMH's general plans. Mr. DeWolf loved the overall idea but made clear that any encroachment onto HRD land could be a problem and that IMH should plan to include its parking on site.

IMH entered into a contract with the seller on October 12, 2017. That same day, Arianne Monroe, local general counsel for HHC, emailed counsel for IMH to memorialize a phone conversation. She reiterated, as they had discussed, that the Property is "subject to a number of deed restrictions and covenants," including the 1998 Declaration of Restriction which required IMH to continue to operate the hotel; the Special Covenants that required IMH to get ARC's approval for a new use of the property, as well as height and lot coverage restrictions; the General Covenants prohibition on residential use; and the Parking Covenants.

Ms. Monroe also advised that "to the extent new building(s) are constructed," IMH was responsible for constructing "any additional [parking] spaces required" based on the "Downtown Methodology" adopted as part of the Parking Covenants. Further, because the Common Parking Areas were non-exclusive and used for Merriweather Post Pavilion events, if ARC approved residential uses, it would likely be "necessary to 'self-park' (on the [Property]) so as to ensure spaces are available to its residents." Mr. Costello understood this to mean that IMH would have to construct parking on site and not on HRD's property, which also was consistent with his conversations with Mr. DeWolf.

IMH settled on the purchase of the Property on December 14, 2017, paying $21.5 million.

### IMH's Post-Purchase Communications with HRD and ARC

About two months after purchasing the Property, counsel for IMH wrote to Ms. Monroe to lay out its proposed redevelopment of the lot in more detail and enclosed the initial concept plans. It proposed a "multi-use project incorporating office, residential, and recreational uses as well as a hotel and conference center[.]" IMH wanted to "solicit HRD's feedback on specific areas of concern that may need to be addressed" in the hopes of beginning "a collaborative working process . . . to facilitate the approvals necessary[.]"

IMH's proposed plan for the Property had "four elements": 1) redevelopment of the existing hotel and conference center and demolition of the Lodges; 2) construction of a 185,000 square foot commercial office building interconnected with the hotel conference center; 3) construction of a 200,000 square foot 200-unit residential building

next to the office building; and 4) a 45,000 square foot tennis facility. IMH calculated its parking needs based upon the Downtown Methodology to be 810 spaces, in addition to the hotel's parking entitlements in the Common Parking Areas. It proposed meeting those requirements by building an extension of an existing hotel garage and construction of a "new below-grade parking garage underneath the Project[.]" As proposed, the below-grade parking would encroach into the shared parking area on HRD's land. It recognized that HRD may be unwilling to accommodate this request because HRD was planning to redevelop the shared parking area.

In a section entitled "Requested Approvals," IMH asked for ARC's approval of the use changes under the Special Covenants for the residential, office, and recreational uses; HRD's approval under Parking Covenant (c) of the "alteration to the use and size of the existing improvements on the Property, since they will result in the need for additional parking"; HRD's waiver of the prohibition on residential use in the General Covenants to the extent it applied; and ARC's approval under the Parking Covenants of the modifications to the existing parking facilities.

A little over a month later, in March 2018, Ms. Monroe responded that she had forwarded the conceptual plans to Mr. DeWolf and Greg Fitchitt, then Vice President of Development for HHC, for their review and to ARC for its preliminary review. Ms. Monroe advised that, with respect to the proposed use changes, HRD agreed that the redevelopment of the hotel and the demolition of the Lodges were desirable. HRD further agreed:

-10-

that a change in use that includes residential and office components, properly sized and designed, may be appropriate and consistent with the vision of a more urban mixed-use environment. Thus, HRD will, subject to agreement on the various elements of the project, agree to the alteration to the use and size of existing improvements and to provide a waiver of the prohibition against residential use under the General Covenants for an approved project.

ARC also completed its preliminary review of the "proposed plans for the change of use . . . and modification to the existing parking facilities . . . and has evaluated the necessity, suitability, nature, quality, and compatibility of the proposed uses." ARC's preliminary review comments were attached to the letter. ARC generally approved of the proposed use changes except for the recreational facility, which it did not agree was "appropriate in this Downtown development area."

The attached comments from ARC were authored by Bill Nitzel, an architect and member of ARC. ARC generally approved the concept plans but made suggestions for reconfigurations of various buildings. IMH was directed to provide more detail on the underground parking and the encroachment onto HRD property was deemed to be inappropriate and likely unnecessary.

Based upon these comments, Mr. Costello understood that ARC approved of the change to residential use and the on-site parking, but that reconfiguration of those aspects of the proposal was appropriate.

## Phase 1 is Approved by ARC

The first phase of the project was the renovation of the hotel and construction of an addition to the convention center. IMH was converting the hotel from a Sheraton to

Marriott Autograph. IMH pursued and received final ARC approval for Phase 1 on November 8, 2019. Thereafter, construction commenced on Phase 1.

## Phase 2 Conceptual Plans Presented to ARC

Meanwhile, IMH hired an architectural design firm, Machado Silvetti, to complete the final plans for Phase 2, which was the demolition of the Lodges and the construction of the mixed-use development in its place. In August 2019, IMH emailed Nancy Tucker, the administrator for ARC and an employee of HHC, to ask if one of the principals at Machado Silvetti could present the plans to ARC in person. Ms. Tucker forwarded that request to Mr. Fitchitt, who had been promoted to take over Mr. DeWolf's job after he died.

Ms. Tucker responded the next day that this should be a "meeting with HRD reps (not just the ARC) in its role as master developer in the area. HRD has different rights with regard to changes in use and other restrictions that are in the deed and restrictive covenants, from the role that the ARC plays in plan review."

The meeting went forward on September 25, 2019. In addition to the members of ARC, also present at the meeting were Mr. Fitchitt, Gabe Chung, an HHC vice president who managed HRD development in Columbia, and Ms. Tucker. The plans "put all of the parking on [IMH's] property[,]" eliminating any encroachment onto HRD's property. The parking met the "parking counts" and did not require any increase in shared parking in the Common Parking Areas. The uses and the size of the proposed buildings did not change.

On November 1, 2019, Ms. Tucker sent IMH ARC's response to the plans. In her cover letter, Ms. Tucker emphasized that because IMH's submission "contains uses that are either new uses not previously approved and/or uses that are prohibited by applicable recorded documents[, d]ecisions regarding the approval or denial of those are HRD's, as the Owner/ Declarant under the Deed and the Covenants, and must be sought directly from HRD in that capacity." Thus, ARC's response to the plans remained "*subject to approval of and granting of Deed and Covenant restriction waivers by HRD for the new uses.*" (Emphasis in original.)

**HRD Rejects IMH's Plans for Phase 2**

On November 20, 2019, Ms. Monroe wrote to Mr. Costello to advise that HRD had learned that IMH had scheduled a "Pre-Submission Meeting" with Howard County permitting authorities regarding the Phase 2 plans. Given that IMH had not yet sought waivers from HRD "of the Deed and Covenant restrictions for the new or prohibited uses" and given that HRD could grant or deny such requests in its "sole and absolute discretion," Ms. Monroe advised that it was "highly unusual" for IMH to seek County or ARC approvals prior to doing so.

Mr. Costello responded, expressing confusion and asking Ms. Monroe to clarify which recorded documents HRD asserted empowered it to approve or reject IMH's plans.

On December 9, 2019, Ms. Monroe wrote to counsel for IMH stating that, to the extent that it was under the impression that HRD had consented to or waived objections to the use changes on the Property, that was incorrect and unsupported by the previous correspondence. She advised:

-13-

Thus, as stated in the ARC's recent preliminary review, HRD has not consented or agreed to (i) any residential or retail uses of the [Property], (ii) the construction or use of any onsite parking on the [Property] (other than the 10 temporary spaces noted in the recorded covenants), or (iii) any redevelopment of the [Property] that would result in an increase to the [Property]'s common area parking needs beyond its current level (that his proposed plan requests).

As to whether HRD is willing to approve the requested use changes and parking arrangement included in the latest conceptual iteration of his re-development plan, ***HRD respectfully rejects the proposal***. ***HRD makes this decision in its sole and absolute discretion, as reserved to it in the referenced recorded documents***. Waiving the applicable restrictions is viewed as contrary to HRD's interests, both as an owner/developer of its own parcels and as the Community Developer under the Downtown Columbia Plan, due to a number of potential issues including, but not limited to, excessive massing, forgone CEPPA cost reimbursement, and a variety of other negative impacts to traffic, transportation, infrastructure, view corridors, and public access.

(Emphasis in original omitted; further emphasis added.)

### IMH Files Suit

On March 3, 2022, IMH filed the instant lawsuit against HRD asserting three counts. In Count I, it sought declaratory relief that the covenants granted ARC, not HRD, authority to review and approve use changes to the Property; that HRD had improperly interfered in ARC's approval process; and that HRD was bound by its prior statements approving on-site parking on the Property. Alternatively, it asked the court to declare the covenants obsolete and unenforceable to the extent they prohibited residential use and on-site parking. In Count II, IMH asserted that it had detrimentally relied upon representations and commitments made by HRD and ARC and suffered damages as a direct and proximate result thereof. It asked the court to order that HRD was estopped from reneging on its prior consent to the change in use and on-site parking, or,

-14-

alternatively, to award damages. In Count III, it asserted a claim for breach of the covenants, arguing that HRD had interfered in ARC's approval process. IMH sought specific performance or, in the alternative, damages.

HRD promptly moved to dismiss or for summary judgment on all three counts. As pertinent, it asserted that it, not ARC, retained authority to approve new uses – including residential and on-site parking – and had exercised that authority properly, as master developer, when it rejected IMH's proposal as inconsistent with the vision for redevelopment of Lakefront North.

The circuit court heard argument and, on August 18, 2022, ruled on the motion, granting, in part, and denying, in part, HRD's motion to dismiss the declaratory judgment count, without prejudice, but denying the motion as to the other counts. Because IMH subsequently amended its complaint, we briefly set out the court's pertinent rulings.

The court reasoned that § 7.02 of the Parking Covenants expressly gave ARC, not HRD, authority over evaluating and approving plans to construct new parking facilities on a "Lot," i.e., not on HRD property. Nevertheless, HRD retained power under Parking Covenant (c) to consent to or reject "any alterations to the use or size of improvements as originally built upon such Lot which would result in the need for additional parking areas determined by Articles IV and V[.]" (Emphasis omitted.) In a footnote, the court observed: "Sections IV and V of the Parking Covenants relate to Common Parking Areas which must be built on [HRD]'s designated properties, not on the Grantees' Lots[, such as the Property]. *Arguably, then, this use veto would not relate to parking on the*

-15-

*[Property].*" (Emphasis added.) Since 1986, the Special and General Covenants likewise empowered ARC, not HRD, to approve changes in use.

## IMH Twice Amends Its Complaint

In September 2022, IMH filed its first amended complaint. Count I, as amended, asked the court to declare that the Covenants empowered ARC, and not HRD, to approve use changes and on-site parking; that ARC conditionally approved IMH's Phase 2 plans which included both; that HRD was without authority to interfere in that process or overrule ARC; and that HRD breached the covenants by overruling ARC. Consistent with the trial court's footnote relative to Parking Covenant (c), IMH also asked the court to declare that the covenants "do not require IMH to obtain HRD's consent for a change in use that does not increase parking in the shared parking areas[.]" Alternatively, IMH asked the court to declare that the limitations in the covenants on residential use and on-site parking were obsolete. The relief sought in Counts II and III did not change.[3]

In its second amended complaint, filed in March 2023, IMH amended the relief sought in Count III for breach of the covenants to request damages for the "costs and expenses incurred in the redevelopment thus far, the loss of its right to complete that redevelopment pursuant to the approvals given, and the loss of substantial potential revenue associated with the redevelopment[,] . . . [in excess of] $15,000,000." Alternatively, it sought specific performance.

---

[3] Following the first amended complaint, HRD moved to dismiss or for summary judgment. After holding a hearing on that motion, the court ruled that most of HRD's arguments were an attempt to revisit issues already decided in the prior motion and that there were material disputes of fact relative to the remaining issues.

IMH also added a fourth count seeking declaratory relief relative to HRD's proposed redevelopment of a parcel adjacent to the Property that currently was a Common Parking Area. Count IV ultimately was resolved by the parties at trial and not sent to the jury for decision. It is not before us in this appeal.

## Cross-Motions for Summary Judgment

Following the second amended complaint, HRD again moved for summary judgment on all counts and IMH moved for partial summary judgment on Counts I and IV. The court held a hearing and, on September 14, 2023, ruled on those motions and other ancillary motions not relevant to the issues on appeal. We limit our discussion to Counts I through III.

In ruling on the motions, the court reasoned that the provisions of the covenants prohibiting residential use and on-site parking differed in significant ways. The residential use prohibition was "subject to a possible categorical waiver" in the covenants; the authority to consent to residential use was transferred entirely to ARC in 1986; and ARC was not permitted to "unreasonably with[o]ld" its consent to a change in use.

Conversely, the on-site parking prohibition came with "many more, continuing restrictive conditions[.]" Parking Covenants (a) and (c) both required HRD's consent before a grantee, like IMH, could (a) "employ any portion of [its] lot for Parking" or (c) "permit any alteration to the use or size of improvements originally built" if the alterations would "result in the need for more [off-site parking.]" (Emphasis omitted.) HRD's authority to grant or withhold consent under these provisions did not sunset, as it

-17-

did with the residential use prohibition. Nevertheless, § 7.02 of the Parking Covenants appeared to authorize ARC to consent to construction of parking facilities on a grantee's lot. The court ruled that the Parking Covenants were ambiguous on this point and that it was an issue for the factfinder to determine.

The court ruled as a matter of law that Parking Covenant (c)'s reference to changes in the "use or size of improvements" on a lot did not include the addition of on-site parking. (Emphasis omitted.)

The court ruled that factual disputes precluded the grant of summary judgment on the other outstanding issues.

## **Trial**

The case was tried to a jury over five days. In its case, IMH called Mr. Costello to testify about the communications between IMH and HRD/ARC both prior to and after the purchase of the Property. Mr. Costello was qualified as an expert in the field of real estate development and was permitted to testify about costs he incurred on Phase 1 of the project, lost return on investment occasioned by the delays in commencing Phase 2, and increased interest costs if IMH were to commence construction now. IMH also called an architect at Machado Silvetti, who was accepted as an expert in the fields of architecture and urban design; Mr. Fitchitt; Daniel Levin, a financial analyst for HRD; Mr. Chung;

Mr. Nitzel; and Brad Canfield, an investor with IMH and the vice president of operations at Merriweather.[4]

In its case, HRD called Ms. Tucker, Ms. Monroe, and recalled Mr. Fitchitt.

At the conclusion of the evidence, the court instructed the jurors on the law, including the rulings of law it made prior to trial. As pertinent, the court instructed the jurors that

> HRD's consent to a change in residential use is no longer required after the expiration of the Special Covenant's initial 15-year period (that is, after 1986). Instead, consent is required by ARC, subject to the process and considerations set forth by the Covenants.

> However, different provisions apply as to changes that relate to on-site parking since HRD's consent provisions are not terminated in the same manner, but ARC is given some authority as to changed "use," considering factors that do not include HRD's consent. The possible ambiguity on this point is a question for this jury.

> * * *

> Sections IV and V of the Parking Covenants relate to Common Parking areas which must be built on the Grantors' designated properties, not on the Grantees' Lots [and] this use veto would not relate to parking on the Grantees' lots.

(Record references omitted.)

The case was submitted to the jurors on a special verdict sheet which asked them to decide the following issues, which we paraphrase:

> 1. Whether the restriction on residential use in § 4.02 of the General Covenants is obsolete?

---

[4] IMH also called two witnesses relative to the claim under Count IV that later was withdrawn from the jury's consideration.

2. Whether the restrictions on on-site parking in the covenants are obsolete?

3. Whether IMH's September 2019 proposed plans for Phase II provided all parking required for the proposed new buildings on IMH's property?

4. Whether IMH's September 2019 proposed plans for Phase II did **not** increase the need for shared parking on HRD's property?

5. Whether HRD consented to on-site parking on IMH's property?

6. Whether HRD waived any right they had to consent to on-site parking on IMH's property?

7. Whether HRD breached one or more of the covenants by acting in its "sole and absolute discretion" in rejecting IMH's redevelopment project in its December 9, 2019 letter?

8a. Whether HRD breached its contractual duties by any intervention in ARC's process?

8b. If you answer "Yes," to 8a, what amount of damages do you award IMH for HRD's breach of the covenants?

9a. Whether IMH proved detrimental reliance as defined in the jury instructions?

9b. If you answer "Yes" to 9a, what is the amount of IMH's damages?

The jury answered "Yes" to questions 1-7, 8a and 8b and awarded damages in the amount of $16,995,678.

On May 16, 2024, the court entered an Order and Declaratory Judgment memorializing the verdicts. HRD noted this timely appeal.

# DISCUSSION

## I.

## Construction of the Parking Covenants

HRD contends that the circuit court erred as a matter of law in construing Parking Covenant (c) in conjunction with Articles IV and V of the Parking Covenants. It asserts that if these provisions are given their plain meaning, HRD is entitled to judgment as a matter of law on the breach of contract and detrimental reliance counts or, at a minimum, a new trial.

A restrictive covenant is a species of a contract. *City of Bowie v. MIE, Props., Inc.*, 398 Md. 657, 677 (2007). Interpretation of restrictive covenants is subject to *de novo* review as a legal question. *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 55 (2013). As the Supreme Court of Maryland has explained:

> In construing covenants, it is a cardinal principle that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself. The language of the instrument is properly considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property. This principle is consistent with the general law of contracts. If the meaning of the instrument is not clear from its terms, the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources.
>
> If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement. The rule of strict construction should not be employed, however, to defeat a restrictive covenant that is clear on its face, or is clear when considered in light of the surrounding circumstances.

*RDC Melanie Drive, LLC v. Eppard*, 474 Md. 547, 568-69 (2021) (cleaned up).

With these principles in mind, we turn to the language of the Parking Covenants. The first three lettered introductory provisions of the Parking Covenants establish a shared parking regime. At (a), the owner of a lot is prohibited, without HRD's consent, from using any portion of their lot for parking spaces. At subsection (b), the owner of a lot is obligated to cause parking spaces to be constructed within the "Common Parking Areas" *on HRD's property* in sufficient number and proximity to the improvements on the lots, as required by Articles IV and V. At subsection (c), the owner of a lot is prohibited, without HRD's consent, from permitting "any alteration to the use or size of improvements as originally built upon such Lot which alteration would result in the need for additional *parking areas* as determined by Articles IV and V hereof." (Emphasis added.) Article IV sets out the Parking Indices, which have since been replaced with the Downtown Methodology, and Article V establishes the proximity of parking spaces to the entrances to the businesses in Lakefront North. Read together, these provisions evince an intent to situate all the parking for the business amenities in Lakefront North in Common Parking Areas on HRD's property, rather than on the lots owned by grantees, such as IMH.

As applied here, the parties do not dispute the construction of Parking Covenant (a). It granted HRD the right to consent to (or reject) IMH's plans to use part of the Property for parking spaces, i.e., on-site parking. The jury found, under question 5 on the verdict sheet, that HRD, through its preliminary communications with IMH, consented to on-site parking. HRD does not challenge this verdict on appeal.

-22-

Parking Covenant (b) is not directly at issue, though, as we will explain, is relevant to our analysis of Parking Covenant (c).

The parties disagree about the construction of Parking Covenant (c). HRD contends that Parking Covenant (c) grants it a separate right to consent to (or reject) a change in the use of the Property – such as the change to residential use for Phase 2 – if that change in use results in the need for more parking spaces "without regard to where IMH builds those spaces."[5],[6] (Emphasis omitted.) IMH responds that, when Parking Covenants (a)-(c) are read "holistically and harmoniously," they unambiguously require consent by HRD for on-site parking under (a) and consent by HRD for a use change that increases the need for Common Parking Areas on HRD's property under (c).

Unquestionably, IMH's Phase 2 proposal changed the use of the Property from transient hotel use to a partially residential use, and this use change would significantly increase the number of parking spaces necessary. The jury found under questions 3 and 4 on the verdict sheet that IMH's September 2019 Phase 2 proposal situated all the parking for the redevelopment on the Property and, thus, did not increase the need for any shared

---

[5] HRD argues that IMH agreed that it needed HRD's consent under Parking Covenant (c) and explicitly asked for it in its February 8, 2018, correspondence following its purchase of the Property. Regardless of IMH's original understanding of this provision, it maintained its position that HRD lacked authority to reject IMH's change of use to residential throughout this litigation, and HRD does not argue that IMH's original understanding of this provision amounted to a waiver.

[6] IMH argues that HRD waived the argument that it makes on appeal with respect to Parking Covenant (c) by its conduct at trial. We are not persuaded based on our review of the record that HRD waived this argument.

parking on HRD's property in the Common Parking Areas. These findings are not contested on appeal.

Consequently, the sole issue before us is whether the use change that necessitated the increase in parking spaces on the Property was subject to HRD's veto under Parking Covenant (c). Construing the Parking Covenants as a whole requires that effect "be given to each clause to avoid an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 487 Md. 385, 403 (2024) (cleaned up).

With this in mind, we turn to Parking Covenant (b), which informs our construction of Parking Covenant (c) in critical respects. It requires an owner of a lot in Lakefront North to 1) "cause to be constructed, on land owned by HRD, in such areas as may be designated by HRD, Parking Spaces and related driveways, ramps and sidewalks which are available for the general use of occupants of Town Center, their customers and invitees (hereinafter called 'Common Parking Areas')" and 2) ensure that these parking spaces are "at least sufficient in number" and "are located in such manner *as will satisfy the requirements of Articles IV and V hereof* for the improvements being built upon such Lot[.]" (Emphasis added.) By cross-referencing the Parking Indices and Proximity regulations found in Articles IV and V, Parking Covenant (b) confirms that these regulations govern Common Parking Areas.

The immediately following Parking Covenant (c), which is connected with the conjunction "and," applies to changes in use or the size of improvements on a lot that

"would result in the need for additional *parking areas as determined by Articles IV and V*[.]" (Emphasis added.) The reasonable construction of this subsection is that "parking areas" refers to the same Common Parking Areas referenced in the preceding subsection and that are likewise governed by Articles IV and V.

This conclusion is bolstered by Articles II and IX of the Parking Covenants. Article II defines the term "HRD Parking, Inc." as the entity charged with "undertaking responsibilities with regard to *parking areas*, in Town Center, Columbia" (which includes Lakefront North). (Emphasis added.) Article IX of the Parking Covenants establishes that the "parking areas" that HRD Parking, Inc. is charged with maintaining are the Common Parking Areas and sets out the method of calculating each lot owner's proportionate share of those maintenance costs.

Thus, HRD's right to consent under Parking Covenant (c) only is triggered by a use change that causes the need for "additional parking areas," which we conclude refers to Common Parking Areas on HRD's property. It was not triggered in this case because, as the jury found, IMH's Phase 2 proposal situated all the additional parking on the Property and did not increase the need for additional common parking on HRD's property.

The impact of our holding is twofold. First, it allows IMH to move forward with Phase 2, subject to ARC's reasonable regulation. This is so because the jury made an unchallenged finding that HRD gave its consent under Parking Covenant (a) for IMH to construct on-site parking on the Property, and our holding establishes that HRD lacked an independent veto of the use change under Parking Covenant (c). HRD does not challenge

the trial court's pretrial ruling that, since 1986, ARC, and not HRD, was empowered 1) under the Special Covenants to approve a change in use of the Property from transient hotel accommodations and the related uses, and 2) under the General Covenants to approve residential use and on-site parking. It follows that HRD lacked authority to reject IMH's Phase 2 proposal.

Second and relatedly, HRD breached the covenants by rejecting IMH's Phase 2 proposal because it lacked any authority to do so for the same reasons. This resolves the issue of HRD's liability independent of the claim for detrimental reliance, which we need not reach.

## II.

## Obsolescence

The jurors found, under questions 1 and 2 on the verdict sheet, that the restriction on residential use in § 4.02 of the General Covenants and the restrictions on on-site parking in the covenants were obsolete. In the Order and Declaratory Judgment entered by the court, it declared that "the covenants which had categorically restricted residential use and on-site parking on property now owned by IMH . . . now have become obsolete and unenforceable[.]"

HRD contends that the covenants are not obsolete as a matter of law and that the court erred in instructing the jurors on obsolescence. It seeks, at a minimum, a new trial on this issue or, in the alternative, the entry of judgment in its favor.

"Generally, appellate courts do not decide academic or moot questions." *Att'y Gen. of Md. v. Anne Arundel Cnty. Sch. Bus Contractors Ass'n, Inc.*, 286 Md. 324, 327

(1979). Because of our holding that the court did not err in construing Parking Covenant

(c) and the unchallenged jury verdicts on questions 3, 4, and 5, IMH is entitled to move

forward with Phase 2 subject to ARC's reasonable regulation independent of the jury's

verdict on obsolescence. HRD's liability for breach of the covenants also is independent

of those verdicts. It follows that the jury verdicts on obsolescence are immaterial to the

outcome of this appeal, and there is no justiciable issue pending between the parties with

respect to obsolescence.[7]

### III.

### Damages

It is well-established that "a plaintiff may not doubly recover the same damages

under different legal theories that arise from the same basic facts[.]" *AXE Props. &

Mgmt., LLC v. Merriman*, 261 Md. App. 1, 46 (2024). HRD contends that the damages

awarded by the jury are duplicative because IMH recovered "past damages for the

bargain [Mr.] Costello believed he struck *and* prospective damages for future

performance." (Emphasis in original.) Alternatively, HRD argues that Mr. Costello's

---

[7] There is merit to HRD's contentions of instructional error on obsolescence. The jury was not instructed that the first step in analyzing obsolescence was to determine the purpose of each restrictive covenant. *See City of Bowie v. MIE, Props., Inc.*, 398 Md. 657, 681-82 (2007) (explaining that the first step of the analysis of the continuing vitality of a restrictive covenant is "an examination of the [c]ovenants' purpose as indicated by their actual language"). Likewise, the jury was improperly instructed on numerous factors it could consider in determining if the relevant covenants continued to serve that purpose rather than being instructed that the chief and practically sole factor is "whether there has been a radical change in the neighborhood causing the restrictions to outlive their usefulness." *Id*. at 687 (cleaned up).

expert testimony was "untethered to any evidence" and did not support the damages award. HRD seeks a new trial on damages or, alternatively, remittitur.

IMH responds that the jury awarded "two distinct elements of damage[s], which were awarded only once" and that those damages were supported by sufficient evidence. For the following reasons, we agree with IMH.

At trial, HRD objected when IMH proffered Mr. Costello as an expert in the fields of "real estate development and real estate development costs and construction costs[.]" At the bench conference that followed, counsel for HRD argued that Mr. Costello was not qualified to opine about "project[ed] future earnings, future profits[.]"

The trial court questioned IMH's counsel about whether Mr. Costello was going to testify to "lost profits and future profits" or "just what he's spent[.]" IMH's counsel responded, in part, that Mr. Costello would testify about "the lost return on investment [("ROI damages")] and increased interest costs" ("Increased Interest damages"). The court asked: "If [IMH] prevails and the jury decides, in effect, that these covenants are either obsolete or no longer enforceable, wouldn't that eliminate future damages?"[8] Counsel for IMH agreed that that would "eliminat[e] a lot of the damages," explaining that IMH was "going to make an election" and would only be seeking the "two sets of

_____

[8] As explained in sections I and II of this opinion, this Court's and the trial court's construction of the covenants, coupled with the jury's findings on consent, also permitted IMH to proceed with Phase 2 subject only to ARC's reasonable regulation, independent of the verdicts on obsolescence. Thus, this also eliminated future damages.

-28-

damages[.]" Counsel reiterated that the ROI damages and Increased Interest damages both were *present* damages.

The trial court sustained HRD's objection "as to any speculative future damages particularly since it's kind of a Catch-22 that if you win this case there's going to be a change in the application and enforcement of [the] covenants." IMH agreed, stating, "[Mr. Costello] doesn't intend to testify to that." The court allowed Mr. Costello to testify as an expert (and a lay witness) on the ROI damages and Increased Interest damages.

Mr. Costello testified that he and his partners invested over $15 million in redeveloping the Property and, since HRD's rejection of Phase 2, the Project had a "negative return on investment." This was unsurprising because "the whole thing was done to have a Phase 2. And without a Phase 2 we never would have bought the [P]roperty. We weren't in the hotel business. This was looked at as a single project with two phases. And we've ended up with a hotel that loses money."[9] Thus, according to Mr. Costello, the negative return on investment was directly related to HRD's rejection of Phase 2.

---

[9] This testimony was consistent with counsel for IMH's description of those damages at a bench conference:

> So IMH put 15 million dollars into the project with the idea that they were going to be able to build Phase 2 and recoup a return on their investment. They were unable to do that because of HRD's actions. And so right now, you know, it sits as The Lodges and they're not able to get a return on that investment. That's what this calculation is.

Mr. Costello calculated the ROI damages by multiplying the total investment of $15 million in capital by a 12% anticipated rate of return for the period of four years and two months between the HRD rejection letter (December 9, 2019) and the first day of trial (April 8, 2024). He based the 12% figure on the return on investment for Little Patuxent Square and other similar projects, but was "a little bit more conservative." IMH introduced into evidence a damages summary exhibit ("Exhibit 22") that reflected Mr. Costello's calculations. Using these figures, the total ROI damages were $7,560,000.

Turning to the Increased Interest damages, Mr. Costello testified that interest rates had more than doubled since HRD sent the rejection letter at the end of 2019 and, as a result, the cost of financing Phase 2 would now be much more expensive. Mr. Costello calculated this set of damages by taking "the project costs [including] the design, the interest carry, the construction, the full development costs and figured out how much interest it would have cost had we been able to build it back at the time when the approval was denied versus today's interest rates." He explained that he calculated the increased interest damages over a five-year period – three years to construct Phase 2 and two years to reach "stabilization[,]" which is the point when the project begins performing financially. He calculated the total Increased Interest damages to be $9,435,678, comprising $4,043,862 for the construction phase and $5,391,816 for the stabilization phase. These calculations likewise were reflected on Exhibit 22.

IMH's total damages amounted to $16,995,678. This is the figure awarded by the jury.

HRD contends that the $7,560,000 in ROI damages were "lost profits" and that IMH was not entitled to receive that return *and* go forward with Phase 2, thus allowing it to earn that same 12% rate of return once the project is complete. We disagree.

The ROI damages are not lost profits, but delay damages for the four-year, two-month period when no action could be taken on Phase 2 because of HRD's December 2019 rejection letter, which itself was in breach of the covenants. As a direct result of HRD's breach, IMH was forced to run an unprofitable hotel for over four years instead of completing Phase 2, which was the profitable phase of the project. Independently, it also will cost IMH much more to finance the construction of Phase 2 occasioned by the increase in interest rates. These two sets of damages were not duplicative and neither will result in IMH realizing a double recovery when it is able to complete Phase 2.

Turning to HRD's sufficiency argument, we are satisfied that Mr. Costello's testimony supported the award of damages. Compensatory damages "'must be proved with reasonable certainty, and may not be based on speculation or conjecture[.]'" *Carter v. Wallace & Gale Asbestos Settlement Tr.*, 439 Md. 333, 350 (2014) (quoting *Asibem Assocs., Ltd. v. Rill*, 264 Md. 272, 276 (1972)). Reasonable certainty, however, is not "mathematical certainty[.]" *Brock Bridge Ltd. P'ship, Inc. v. Dev. Facilitators, Inc.*, 114 Md. App. 144, 157 (1997) (emphasis omitted).

"In a breach of contract action, upon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty." *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594 (2007). In this context, "'reasonable

certainty' of contract damages means the likelihood of the damages being incurred as a consequence of the breach, and their probable amount." *Id*. at 595. "Losses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as 'reasonably certain' and therefore recoverable as contract damages." *Id*.

Additionally, courts "'require[] expert opinions to be established within a reasonable degree of probability.'" *Reiss v. Am. Radiology Servs., LLC*, 241 Md. App. 316, 334 (2019) (quoting *Karl v. Davis*, 100 Md. App. 42, 51-52 (1994)), *aff'd*, 470 Md. 555 (2020). This requirement exists "'to make sure that the expert's opinion is more than speculation or conjecture.'" *Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 581 (2020) (quoting Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 1404, at 649 (4th ed. 2010)).

HRD contends that Mr. Costello's expert testimony "relied on figures unmoored from reality[.]" Specifically, it challenges the 12% return on investment figure used to calculate the ROI damages that Mr. Costello testified was derived, largely, from the return on investment achieved with Little Patuxent Square. HRD asserts that there was "no evidence that [the Property]" and Little Patuxent Square were sufficiently alike to generate equivalent returns, and there was evidence that they were dissimilar in that the Property also had to sustain a hotel that Mr. Costello testified was unprofitable.

Mr. Costello testified, however, that IMH purchased the Property with the intent to "build something similar" to Little Patuxent Square in place of the Lodges, i.e., Phase 2. He elaborated that Phase 2 of the Project was envisioned as the building configuration of Little Patuxent Square "unfold[ed]" and as a "very, very similar project." He also

explained that the 12% figure was more conservative than the rate of return on Little Patuxent Square. This was evidence supporting Mr. Costello's opinion that Phase 2 of the Project would generate a similar, though lower, rate of return than Little Patuxent Square, and to establish the ROI damages with reasonable certainty.[10]

HRD asserts that Mr. Costello's "capital costs analysis . . . is even flimsier." Mr. Costello testified that he calculated the overall project costs for Phase 2 based on "historical information" from Little Patuxent Square, explaining each figure that went into the $108,400,000. He also based it on his thirty-two years of experience in the construction industry. We conclude that Mr. Costello's calculations were not speculative and supported the Increased Interest damages award.

For all these reasons, we affirm the jury's damages award.

> **JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[10] Mr. Levin, a financial analyst for HRD, likewise testified that HRD anticipated that its proposed mixed-used development on an adjacent parcel to the Property would generate a 12.1% rate of return, further supporting the reasonableness of the figure utilized by Mr. Costello.